AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

In the Matter of the Search of )
*a Red Ford F150 with Oklahoma license plate LCN715* )

Case No. 25·mj-600·CDL

)
) **FILED UNDER SEAL**
)

FILED

JUL 16 2025

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment  "A-2"

located in the _Northern_ District of _Oklahoma_ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

*Code Section*                                         *Offense Description*

**18 U.S.C. § 2251(a)**                            **Sexual Exploitation of a Child**

The application is based on these facts:
**See Affidavit of TFO Eric Leverington, HSI, attached hereto.**

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Eric Leverington, Task Force Officer, HSI
*Printed name and title*

Subscribed and sworn to by phone.

Date: July 16, 2025

City and state:  Tulsa, Oklahoma

*Judge's signature*

Christine D. Little, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **In the Matter of the Search of a Red Ford F150 with Oklahoma license plate LCN715** | Case No. _____ <br><br> **FILED UNDER SEAL** |

**Affidavit in Support of an Application
Under Rule 41 for a Warrant to Search and Seize**

I, Eric Leverington, being first duly sworn under oath, depose and state:

**Introduction and Agent Background**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for two separate search warrants for the person and vehicle specifically described in Attachments A-1 and A-2 of this Affidavit, including:

    a. Search Warrant 1: The person known as Marty Lee MARTIN, date of birth xx/xx/1970, further described in Attachment A-1, for the things described in Attachment B.

    b. Search Warrant 2: The vehicle described as a =Red, 2015, Ford F150 with Oklahoma license plate LCN715, VIN1FTEW1EF4FKE38668 ("SUBJECT VEHICLE"), described further in Attachment A-2,

the content of electronic storage devices located therein, for evidence, instrumentalities, contraband, and/or fruits of violations of Title 18, United States

Code, Section 2251(a) (Sexual Exploitation of a Child), which items are more specifically described in Attachment B of this affidavit.

2. I am a Task Force Officer with Homeland Security Investigations (HSI) and have been since February 2019. I am currently assigned to the Tulsa Resident Agency of the HSI Dallas Field Office. In addition to becoming a Task Force Officer with HSI, I have been employed as a Police Officer with the Tulsa, Oklahoma Police Department since July 6, 1998. I am currently assigned to the Tulsa Police Department Sexual Predator Digital Evidence Recovery Unit with a primary focus on child exploitation investigations. Since becoming a Task Force Officer with HSI, I have investigated violations of federal law, including federal violations concerning child pornography and the sexual exploitation of children. I have gained experience through training in classes and work related to conducting these types of investigations. Further, as a Homeland Security Investigations Task Force Officer, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3. As part of my duties as a HSI Task Force Officer, I investigate criminal violations relating to child pornography, including Advertising to Receive, Exchange, Produce, Display, Distribute, and Reproduce Child Sexual Abuse Material (CSAM), and the production, transportation, distribution, receipt, and possession of CSAM, in violation of 18 U.S.C. §§ 2551(d)(1), 2251A(b), and 2252. I have received training in the areas of CSAM and child exploitation and have observed and reviewed numerous examples of CSAM, as defined in 18 U.S.C. §

2

2256, in all forms of media. I have been involved in several CSAM investigations and am familiar with the tactics used by individuals who manufacture, collect, and distribute CSAM.

4. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information, including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during this investigation.

5. Based on my training, experience, and the facts outlined in this affidavit, there is probable cause to believe that evidence of violations of Title 18, United States Code, Section 2251(a) (Sexual Exploitation of a Child) will be located on the person of Marty Lee MARTIN.

### Jurisdiction

6. "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a.

7. The requested search is related to the following violations of federal law:

3

a. Title 18, United States Code 2251(a) – Sexual Exploitation of a Child – is violated by any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

8. Venue is proper because the person or property described in this affidavit is located within the Northern District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

## Definitions

9. The following definitions, inclusive of all definitions contained in 18 U.S.C. § 2256, apply to this affidavit and the attachments incorporated herein:

a. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in

4

sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct;

b. "Internet Protocol address" or "IP address" refers to a unique number used by a computer or electronic device to access the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses may also be static, which means the ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet;

c. "Electronic Mail," commonly referred to as email (or e-mail), is a method of exchanging digital messages from an author to one or more recipients. Modern email operates across the Internet or other computer networks. Email systems are based on a store-and-forward model; that is, email servers accept, forward, deliver, and store messages. Neither the users nor their computers are required to be online simultaneously; they need only connect briefly, typically to an email server, for as long a period of time as it takes to send or receive messages. One of the most commons methods of obtaining an email account is through a free web-based email service provider such as, Outlook, Yahoo, or Gmail. Anyone with access to the Internet can generally obtain a free web-based email account;

d. A "hash value" or "hash ID" is a unique alpha-numeric identifier for a digital file. A hash value is generated by a mathematical algorithm, based on the file's

5

content. A hash value is a file's "digital fingerprint" or "digital DNA." Two files having identical content will have the same hash value, even if the file names are different. On the other hand, any change to the data in a file, however slight, will change the file's hash value, even if the file name is unchanged. Thus, if two files have the same hash value, they are said to be identical, even if they have different file names;

e. "Cloud storage service" refers to a publicly accessible, online storage provider that can be used to store and share files in large volumes. Users of cloud storage services can share links and associated passwords to their stored files with others in order to grant access to their file collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop computers, laptops, mobile phones or tablets, from anywhere. Many services provide free access up to a certain size limit;

f. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state;

g. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years;

6

h. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form;

i. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person; and

j. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## Probable Cause

10. On 6/27/25, Tulsa Police Detective Raymond Ackermann read an Oklahoma Department of Human Services referral involving an Electronic Peeping Tom incident that occurred in the days just before 06/22/2025. The report alleged that an adult male, Marty Lee MARTIN, secretly recorded the 15-year-old minor victim, MV, while she was nude at 18624 45th Place, Tulsa, Oklahoma 74134. That address is within the boundaries of the Muscogee (Creek) Nation and the limits of the Northern District of Oklahoma of the United States District Court.

7

11. On 7/11/2025, Tulsa Police Detective Raymond Ackermann observed a forensic interview of the MV, and interviewed her mother, Sharla Winfrey.

12. During her forensic interview, the MV stated the following:

13. That on 6/18/25, around 10:00 pm, she was at home at 18624 E 45th Pl S, Tulsa, OK 74134. MV stated that her mother, Sharla, was home, lying down in her own bed, MV's older sister, Paige, was in her room upstairs, and MV's mother's live-in boyfriend, Marty Lee MARTIN, was outside watching television on the back porch. MV stated MARTIN's behavior was out of the ordinary, so much so that MV asked him if everything was okay, and he told her everything was fine.

14. MV stated that while Paige and Sharla went to bed and MARTIN was outside watching television, she went to take a shower in the bathroom nearest her bedroom. After the shower, MV walked from the shower to her bedroom naked, passing only a spare/guest bedroom on the way down the hallway. KW stated she only had a towel wrapped around her hair/head and that she was otherwise naked. MV says she does this regularly since she is usually the only occupant of that wing of the house.

15. MV stated that while passing the dark spare bedroom, on her walk from the bathroom to her room, she noticed a phone propped against a pillow on the bed in the spare bedroom with its camera lens pointing towards the door and the screen backlighting it against the pillow used to prop it up. MV indicated that the phone was positioned strangely and did not appear to be randomly placed on the bed.

8

16. MV recognized the phone as MARTIN's and, after getting dressed, went back to the spare room to retrieve it and return it to him. MV said the phone was an Apple iPhone, possibly iPhone 15, with a "Western" leather phone case that folds open and stores cards. When MV picked up the phone, she saw that the phone was recording, so she left the phone in the room and immediately alerted her mother that she believed MARTIN intentionally recorded her naked.

17. After alerting her mother of the incident, MV stayed away from MARTIN while her mother confronted him. MARTIN eventually left the home that night. MV stated, that after thinking about it, she remembers seeing the phone in the same position in the spare bedroom the night before, but just thought MARTIN left it there by accident.

18. Immediately after MV's forensic interview, Detective Ackermann interviewed MV's mother, Sharla. Sharla corroborated that the incident occurred on a Wednesday night at the home at 18624 E 45th Pl S, Tulsa, OK 74135. Sharla explained it was a typical night and that the family had eaten dinner together with MARTIN's adult son, who came to visit. Sharla corroborated MV's observation that MARTIN was acting strangely after dinner and that he isolated himself outside, watching television and not interacting with the family as he usually would.

19. Sharla said that around 9:30 p.m., she went to bed in her bedroom while Paige went to her room, MARTIN went outside to watch more television, and MV went to take a shower. At about 10:15 pm, Sharla said that MV woke her up, alerting her that she had walked from the bathroom to her room naked and that she had

9

found MARTIN's phone recording the hallway where she was naked. Sharla explained that MV gave her the details of how the phone was placed in the room and how the screen appeared to be recording. Sharla corroborated that MV told her she believed she saw MARTIN's phone in the same position the night before.

20. Sharla says that when she went downstairs to confront MARTIN, she heard him enter the home through the screen door. When she got to the back patio, Sharla said MARTIN was already back outside and had already retrieved his phone from the spare bedroom.

21. Sharla demanded to see MARTIN's phone, and he gave it to her. Sharla observed a video that was about fourteen minutes long in his photos folder. Sharla explained that she watched the beginning of the video, where MARTIN was setting up the phone to record, and the end of the video, showing MARTIN stopping the recording. Sharla said she did not observe the rest of the video. Sharla said she then gave the phone back to MARTIN and had him delete the video, and she thinks he complied.

22. Sharla asked MARTIN why he would record her daughter naked, and he responded by saying, "I'll do whatever, I'll go to counseling, I'll do whatever it is to fix this". Sharla told him there was no fixing this situation and demanded that he leave the house immediately. Sharla said that after MARTIN collected his things, he left the house and has had no further contact with MV.

23. Sharla said MARTIN could have had prior knowledge that MV walks naked to her room after showering in a couple of ways. Sharla said MARTIN had a specific

10

chair in the living room with a unique angle that allowed him to see the door to the bathroom. Sharla believes it is likely that MARTIN could have previously seen MV walk back to her room naked from that vantage point. Sharla also stated that there was a window in the hallway that MV used, which would be easily visible from the back patio area, where MARTIN is frequently watching television, around the time MV takes a shower. Sharla believes he witnessed this behavior in the past, and that is how he knew when and where to set up a camera to record MV secretly.

24. Sharla said MARTIN was likely now living at a home he owns at 15702 S Birch Ave, Glenpool, OK 74033. Sharla says MARTIN drives a red Ford F150 pickup truck.

25. On 7/11/25, Detective Ackermann went to the crime scene at 18624 E 45th PL, Tulsa, OK 74134. Ackermann took photos and videos of the home, including the position of MARTIN's chair in the living room, the hallway KW used, the room where the phone was found, and the window from the patio.

26. Ackermann confirmed that where MARTIN's chair was in the living room, there is a clear line of sight to the bathroom door and that anyone seated in that chair could easily see people walking in and out of the bathroom. Ackermann also confirmed that if the hallway blinds were open, anyone could watch people walking through the hallway that MV used on the night of the incident.

27. Ackermann set a phone on the pillow in the spare bedroom of the home exactly as it was described by MV and made a demonstrative recording. Ackermann walked from the bathroom to the bedroom as MV said she did on the night of the

11

incident, while the phone recorded. The recording clearly shows Ackermann walking in the hallway.

28. Detective Ackermann searched vehicle registration records for MARTIN. According to the State of Oklahoma motor vehicle records, MARTIN owns and has current registration on a 2015 red Ford F150 bearing Oklahoma license plate LCN715 and the VIN: 1FTEW1EF4FKE38668.

## Characteristics Common to Individuals
## With Intent to Collect, Receive, or Distribute Child Pornography

29. Based on my previous experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals with intent to view and/or possess, collect, receive, or distribute images of child pornography:

a. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes,

12

books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Likewise, individuals with intent to view and/or possess, collect, receive, or distribute pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

d. Such individuals may also take it upon themselves to create their own child pornography or child erotica images, videos or other recordings, or engage in contact sex offenses with children. These images, videos or other recordings may be taken or recorded covertly, such as with a hidden camera in a bathroom, or the individual may have child victims he or she is abusing in order to produce child pornographic or child erotica images, videos or other recordings. Studies have shown there is a high cooccurrence between those who traffic in child pornography and commit sex offenses with children. Such individuals may also attempt to persuade, induce, entice, or coerce child victims in person or via communication devices to self-produce and send them child pornography or to

13

meet in person for sex acts. These images, videos or other recordings are often collected, traded, or shared.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted"[1] it.

f. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

g. Based on my training and experience, I know that such individuals may use their financial information to buy and sell child pornography online and purchase software used to mask their online activity from law enforcement. For instance,

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370–71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010).)

individuals may purchase cryptocurrency such as Bitcoin to buy and sell child pornography online. The use of cryptocurrency provides a level of anonymity because it masks the user's identity when conducting online financial transactions and provides a means of laundering illicit proceeds. Financial information may provide a window into the identities of individuals seeking to buy or sell child pornography online by tying the illicit transactions back to the user. Financial information contained on an electronic device containing child pornography may also provide indicia of ownership. Further, based on my training and experience, I know that individuals involved in the trafficking of child pornography may use sophisticated software, such as router configuration software, virtual private networks, proxy servers, cryptocurrency exchanges, or other anonymizing software, in conjunction with these illicit financial transactions to provide dual layers of anonymity and prevent law enforcement detection. Financial information may indicate which services were purchased to obscure an individual's identity.

h. Based on my training and experience and speaking with other special agents, I know that such individuals have taken their electronic devices and storage media, which contain their collections of child pornography, with them when they have moved or changed residences.

i. Individuals with intent to view and/or possess, collect, receive, or distribute child pornography prefer not to be without their child pornography for any

15

prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## Background on Child Pornography, Computers, the Internet, and Email

30. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a. Computers, smartphones[2] and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers and smartphones basically serve four functions in connection with child pornography: production, communication, distribution, and storage;

b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos;

---

[2] Smartphones are a class of mobile phones and of multi-purpose mobile computing devices. They are distinguished from feature phones by their stronger hardware capabilities and extensive mobile operating systems, which facilitate wider software, internet (including web browsing over mobile broadband), and multimedia functionality (including music, video, cameras, and gaming), alongside core phone functions such as voice calls and text messaging.

c. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers and smartphones and tablets around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone;

d. A device known as a router in conjunction with a modem allows numerous computers to connect the Internet and other computers through the use of telephone, cable, or wireless connection. A router, in conjunction with a modem, can connect literally millions of computers around the world. Routers often store information as to which computer used a modem to connect to the Internet at a specific time and location. This information when viewed along with the traces or "footprints" can provide valuable information on who distributed and/or received a visual depiction of a minor engaged in sexually explicit conduct and who possessed and accessed with intent to view a visual depiction of a minor engaged in sexually explicit conduct;

e. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and

17

"thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also almost always carried on an individual's person (or within their immediate dominion and control) and can additionally store media;

f. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion;

g. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone or external media in most cases; and

31. As is the case with most digital technology, communications by way of computer or smartphone can be saved or stored on the computer or smartphone used

18

for these purposes. Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or smartphone, or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer or smartphone user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

### Specifics of Search and Seizure of Computer Systems

32. As described above and in Attachment B, this application seeks permission to search for records that might be found on the person of MARTIN, and/or the Subject Vehicle, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media, such as a cellular phone, smartphone, or tablet. Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

33. I submit that if a computer or storage medium is found on the person of MARTIN, and/or the Subject Vehicle, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data;

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file;

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is

typically required for that task. However, it is technically possible to delete this information;

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

34. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrants, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium on the person of MARTIN, and/or the Subject Vehicle, because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the

sequence in which they were created, although this information can later be falsified;

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that logs the following: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed

networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement);

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when;

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant;

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent;

f. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it

24

is used as a means of committing the criminal offense. The computer is also likely

to be a storage medium for evidence of crime. From my training and experience, I

believe that a computer used to commit a crime of this type may contain: data

that is evidence of how the computer was used; data that was sent or received;

notes as to how the criminal conduct was achieved; records of Internet

discussions about the crime; and other records that indicate the nature of the

offense.

35. Based upon my training and experience and information relayed to me by

agents and others involved in the forensic examination of computers, I know that

computer data can be stored on a variety of computer systems and storage devices,

including external and internal hard drives, flash drives, thumb drives, micro SD

cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable

of storage, smartphones, floppy disks, compact disks, magnetic tapes, memory cards,

memory chips, and online or offsite storage servers maintained by corporations,

including but not limited to "cloud" storage. I also know that during the search of

the person or vehicle it is not always possible to search computer equipment and

storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires

specific expertise and specialized equipment. There are so many types of

computer hardware and software in use today that it is impossible to bring to the

search site all of the technical manuals and specialized equipment necessary to

conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the person and/or vehicle; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a

26

password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

36. Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging

information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

37. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrants and would authorize a later review of the media or information consistent with the warrants. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrants.

### Conclusion

38. Based on the information set forth in this affidavit, I submit there is probable cause to believe that Title 18, United States Code, Section 2251(a) (Sexual Exploitation of a Child), has been violated, and that the contraband, property, evidence, fruits and instrumentalities of this offense, more fully described in Attachment B, are located in the possession of the person and or contained within the vehicle described in Attachments A-1 and A-2. I respectfully request that this

Court issue search warrants for the locations described in Attachments A-1 and A-2, authorizing the seizure and search of the items described in Attachment B.

39. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab; digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the person and/or vehicle. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Respectfully submitted,

Task Force Officer Eric Leverington
Homeland Security Investigations

Subscribed and sworn to by phone on July  16 , 2025.

CHRISTINE D. LITTLE
UNITED STATES MAGISTRATE JUDGE

29

## ATTACHMENT A-2

### Vehicle to be Searched

The vehicle to be searched, provided it is located in the Northern District of

Oklahoma at the time of execution of this warrant, is described as a red 2015 Ford

F150 with Oklahoma license plate LCN715, VIN1FTEW1EF4FKE38668

("SUBJECT VEHICLE"), registered to Marty Lee MARTIN.



2

## ATTACHMENT B

### Particular Things to be Seized

All items that constitute evidence, instrumentalities, contraband, and/or fruits of violations of Title 18, United States Code, Section 2251(a) (Sexual Exploitation of a Child), including:

A. Images/videos/gifs of child pornography or child erotica; files containing images/videos/gifs; and data of any type relating to the sexual exploitation of minors or a sexual interest in children, material related to the possession thereof, and data of any type related to any person employing, using, persuading, inducing, enticing, or coercing any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting such visual depiction of such conduct, in any form wherever it may be stored or found including, but not limited to:

   i. Any cellular telephone, smartphone, tablet, personal digital assistant, digital cameras, external storage devices, and any electronic data storage devices including, but not limited to flash memory devices, and other storage mediums related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography; or relating to the visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual

exploitation of minors;] Any cellular telephone, smartphone, tablet, personal digital assistant, computer, computer system and related peripherals; computer hardware; computer software; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, monitors, printers, external storage devices, routers, modems, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to computer passwords and data security devices and computer-related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to

2

the interest in child pornography; and/or distribute, receive, or possess

child pornography, or information pertaining to an interest in child

pornography, or information pertaining to an interest in child

pornography;

ii. Books and magazines containing visual depictions of minors engaged in

sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the

sexual exploitation of minors or a sexual interest in children;

iii. Originals, copies, and negatives of visual depictions of minors engaged

in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to

the sexual exploitation of minors or a sexual interest in children; and

iv. Stories, text-based files, motion pictures, films, videos, and other

recordings of visual depictions of minors engaged in sexually explicit

conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual

exploitation of minors or a sexual interest in children];

B. Information, correspondence, records, documents or other materials

pertaining to the possession, receipt or distribution of visual depictions of minors

engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or pertaining

to the sexual exploitation of minors or a sexual interest in children, that were

transmitted or received using computer, cellular device, personal digital assistant,

3

or some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

i. Envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual exploitation of minors or a sexual interest in children;

iii. Any and all records, documents, or materials, including any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce including by United States mail or by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256 or relating to the sexual exploitation of minors or a sexual interest in children];

iv. Any and all records, documents, or materials, including any and all address books, names, and lists of names and addresses of minors visually

4

depicted while engaging in sexually explicit conduct, defined in Title 18, United States Code, Section 2256; or relating to the sexual exploitation of minors or a sexual interest in children;

v. Any and all records of Internet usage including user names and e-mail addresses and identities assumed for the purposes of communication on the Internet. These records may include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage mediums] Any and all records of Internet usage including user names and e-mail addresses and identities assumed for the purposes of communication on the Internet. These records may include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage mediums, including CDs or DVDs];

vi. Any physical keys, encryption devices, dongles and similar physical items necessary to access computer equipment, storage devices or data;

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

5

viii. Files, records, programs, logs, electronic communications, scanning

programs, financial records, hacking software, or router configuration

software];

C. Credit card information including, but not limited to, bills and payment

records, and including, but not limited to, records of internet access;

D. Records evidencing occupancy or ownership of the vehicle described above,

including, but not limited to, utility and telephone bills, mail envelopes, or addressed

correspondence;

E. Records or other items which evidence ownership or use of computer

equipment or any of the devices described in this attachment that are found in the

above residence, including, but not limited to, sales receipts, bills for Internet access,

and handwritten notes;

F. Any and all adapters, chargers or other hardware items necessary to charge

the battery, or to maintain the functioning of, any of the equipment described above;

and

G. Any data or materials establishing ownership, use or control of any computer

equipment seized from the Subject Vehicle or from the person of MARTIN.

H. Any and all information, correspondence (including emails and text

messages), records, documents and/or other materials related to contacts, in

whatever form, with minors involving the production, possession and/or distribution

6

of child pornography and the attempt or act of educing, enticing, coercing, or persuading a minor to engage in sexual acts.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.